Priority ✓
Send ✓
Enter —
Closed —
JS-5/JS-6 —
JS-2/JS-3 —
Scan Only —



1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10          WESTERN DIVISION

11

| | |
|---|---|
| 12  WORLDWIDE CHURCH OF GOD, | ) Case No.  CV-97-5306-CAS (CWx) |
| 13                    Plaintiff, | ) |
| 14  vs. | )  **ORDER** |
| 15  PHILADELPHIA CHURCH OF GOD, INC., | ) |
| 16 | ) |
| 17                    Defendants. | ) |

ENTER ON ICMS

NOV 1 5 2002

## I.    BACKGROUND

This case arises from defendant-counterclaimant Philadelphia Church of God's ("PCG") unauthorized use and distribution of Mystery of the Ages ("MOA"), the last work authored by plaintiff Worldwide Church of God's ("WCG") deceased founder, Herbert W. Armstrong.  The factual background of the case is set forth in the Ninth Circuit's opinion in Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110 (9th Cir. 2000) ("Worldwide Church"), cert. denied, 121 S. Ct. 1486 (2001).  In Worldwide Church, the Ninth Circuit held that PCG had infringed WCG's copyright by reprinting and distributing MOA and remanded the case to this Court for the entry of a permanent injunction prohibiting PCG from appropriating the work.  Id.

482

1    at 1121.  In doing so, the Ninth Circuit rejected PCG's defense that its use of <u>MOA</u>

2    constituted "fair use" under 17 U.S.C. § 107.  However, the Ninth Circuit made no

3    ruling with regard to PCG's counterclaim which seeks declaratory relief as to eighteen

4    additional works authored by Armstrong (the "non-<u>MOA</u> works"), which

5    counterclaims seek relief based upon the Religious Freedom and Restoration Act, 42

6    U.S.C. §§ 2000-2000bb-4 ("RFRA"); PCG's claimed fair use; the "work for hire"

7    doctrine; and abandonment.  <u>See</u> Amended Counterclaim, ¶¶ 14-26.

8         After the Ninth Circuit's decision, the parties each filed several motions

9    concerning the non-<u>MOA</u> works.  By order dated November 14, 2001, this Court

10   disposed of the motions as follows: (1) the Court granted WCG's motion to strike

11   PCG's affirmative defenses of RFRA, estoppel, and unclean hands from its amended

12   answer and counterclaim; (2) the Court denied without prejudice WCG's motion to

13   dismiss PCG's first counterclaim seeking a declaration that PCG's exercise of its

14   religion would be substantially burdened in contravention of RFRA if it is not allowed

15   to reproduce and distribute the non-<u>MOA</u> works; and (3) the Court denied WCG's

16   motion for judgment on the pleadings.  In addition, the Court denied in part, and

17   granted in part WCG's motion for summary judgment, finding questions of fact as to

18   whether PCG's use and distribution of the non-<u>MOA</u> works is a "fair use" protected by

19   17 U.S.C. § 107 and whether these works were "works made for hire."  The Court also

20   granted WCG's motion for summary judgment with regard to PCG's request for a

21   declaration that WCG abandoned its copyright in the non-<u>MOA</u> works.  In addition, the

22   Court denied summary judgment on WCG's defense that PCG is barred from obtaining

23   declaratory relief by reason of PCG's bad faith.  Finally, the Court found that even if

24   the Court awarded PCG declaratory relief, WCG would not be compelled to profess

25   religious teachings contrary to its current beliefs in violation of WCG's First

26   Amendment rights, and thus the Court denied WCG's motion for summary judgment

27   on this ground.

28

2

The parties are now before the Court on: (1) WCG's motion for summary judgment as to PCG's first counterclaim seeking a declaration that its right to free exercise of its religion would be substantially burdened in contravention of RFRA if it is not allowed to reproduce and distribute the non-MOA works; (2) WCG's motion for summary judgment as to PCG's second counterclaim seeking a declaration that its use of the non-MOA works constitutes "fair use"; and (3) PCG's motion to reopen limited discovery and for an order finding a waiver of attorney-client privilege.

## II.   WCG's MOTION FOR SUMMARY JUDGMENT REGARDING PCG's FIRST AND SECOND CLAIMS FOR DECLARATORY RELIEF

### A.   Legal Standard for Summary Judgment

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party has sustained its burden, the nonmoving party must then identify specific facts, drawn from materials on file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. See Fed. R. Civ. P. 56(c). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990). See also Celotex Corp., 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. See also Abromson v. American Pacific Corp., 114 F.3d 898, 902 (9th Cir. 1997).

3

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587.

B.    PCG's First Claim for Declaratory Relief (RFRA)

WCG moves for summary judgment on PCG's first claim, entitled "Declaration of the PCG's Right to Use and Distribute the Subject Works,"[1] arguing that PCG has failed to meet its burden to establish the existence of each element of a RFRA claim for three distinct reasons: (1) PCG cannot demonstrate that a central tenet of its religion is substantially burdened by the application of the Copyright Act to the non-MOA works, (2) a RFRA claim may only be litigated against the federal government and not a private church, and (3) even accepting that RFRA applies, the instant application of the Copyright Act is narrowly tailored to serve a compelling government interest. Plaintiff Worldwide Church of God's Motion for Summary Judgment Regarding PCG's First Claim for Declaratory Relief (Religious Freedom Restoration Act) ("Pl. Mot. First Claim") at 9.

_____

[1] PCG seeks a declaration that "the PCG's exercise of its religion would be substantially burdened by an interpretation of the Copyright Act that would make PCG's distribution of the Subject Works free of charge to the public an infringement of a purported copyright of WCG." Amended Counterclaim ¶ 16.

4

The stated purposes of RFRA are "(1) to restore the compelling interest test as set forth in <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963), and <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972), and to guarantee its application in all cases where free exercise of religion is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by the government." 42 U.S.C. § 2000bb-(b). Thus, RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section[.]" <u>Id.</u> § 2000bb-1(a). The term "government" includes "a branch, department, agency, instrumentality, and official (or other person acting under color of law of the United States.)" <u>Id.</u> § 2000bb-2(1). While the statute applies to "all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993," <u>Id.</u> § 2000bb-3(a), the statute more specifically states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." <u>Id.</u> § 2000bb-1(c).

To establish a violation of RFRA, a party must prove that a government practice substantially burdens his ability to exercise his religious beliefs. <u>Id.</u> at § 2000bb-1(a). The government must then demonstrate that there is a compelling governmental interest justifying the infringement upon the individual's liberty. <u>Id.</u> § 2000bb-1(b)(1). Finally, the government must show the regulation is narrowly tailored to advance the compelling interest. <u>Id.</u> § 2000bb-1(b)(2). Should the government fail to demonstrate either of the last two elements, the claimant is entitled to relief under RFRA. <u>Id.</u> § 2000bb-1(c).

First, WCG argues that PCG's RFRA claim fails because PCG cannot establish that a central tenet of its religion is substantially burdened by the application of the Copyright Act to the non-<u>MOA</u> works because WCG has entered into contracts to publish all of the non-<u>MOA</u> works, and thus PCG will be able to purchase each of the

5

1   works for its use in religious practice.  Pl. Mot. First Claim at 10-12.  WCG submits

2   that is has entered into publication contracts with 1st Books Library ("1st Books") to

3   publish all of the non-MOA works at issue in this litigation.[2]  Id. at 8-9.  Each of the

4

5

6      [2] WCG submits contracts that demonstrate that 1st Books has agreed to publish the

7   following works: The Missing Dimension in Sex; The United States and Britain in
    Prophecy; Collection of 4: Why Marriage, Soon Obsolete?, What is Faith?, The Plain

8   Truth About Healing, Who or What is the Prophetic Beast; Autobiography of Herbert W.
    Armstrong, Volume I; Autobiography of Herbert W. Armstrong, Volume II; Collection of

9   2: Which Day is the Christian Sabbath, Pagan Holidays or God's Holy Days – Which?,

10  Collection of 2: The Seven Laws of Success, The Wonderful World Tomorrow, What It
    Will Be Like?; Ambassador College Correspondence Course, Volume I; Ambassador

11  College Correspondence Course, Volume II; Collection of 4: Does God Exist, The Proof

12  of the Bible, What Science Can't Discover About the Human Mind, Just What Do You
    Mean Born Again?; The Incredible Human Potential.  See Declaration of Ralph K. Helge

13  ("Helge Decl."), ¶ 12, Ex. RR.  Each of the contracts appears to have been executed

14  between May 14, 2002, and May 16, 2002.  Id.  The works "will be priced at the top of the
    range set by 1st Books, pursuant to 1st Books standing price schedules."  Helge Decl. ¶ 12;

15  see also id., ¶ 12, Ex. SS.

16

17     The works are to be published with "a new, additional preface that clarifies WCG's
    beliefs that the Subject Works contain doctrinal errors."  Helge Decl. ¶ 14.  Although

18  WCG declares that the preface has not yet been finalized, a "draft of the preface that will

19  likely be used" is included in the appendix of exhibits.  See id., ¶ 14, Ex. VV.  The two and
    a half page preface discusses details about Herbert W. Armstrong's life and the evolution

20  of the development of his religious beliefs.  Id.  The preface also discusses some of

21  Armstrong's beliefs that WCG now believes to be in error.  Id.  The preface closes with
    the following statement:

22

23       Today the Worldwide Church of God is quite a different church in
    mission, emphasis and practices from the church Herbert W. Armstrong

24  founded.  Therefore, it would be a mistake to assume that on any given

25  point the Worldwide Church of God still teaches what Herbert Armstrong
    wrote.  Nevertheless, Herbert W. Armstrong and his Old Testament-based

26  interpretation of Christian faith are part of the American religious heritage

27  of the 20th century.  Therefore, in the public interest, the Worldwide Church
    of God makes the following material written by Herbert W. Armstrong

28  (continued...)

6

works will be published in two forms: (1) in an electronic version that can be downloaded, and (2) as a soft-cover paperback book.[3] Id. ¶ 4. Ralph K. Helge, who negotiated the contracts on behalf of WCG, declares that "[u]nder the timetable established by 1st Books, the Subject Works will be published and available by December 2002, absent any unforseen delays in completing these publication steps." Helge Decl. ¶ 15, 7. [4] Thus, WCG argues that, "all of PCG's alleged religious needs can be completely accommodated under the Copyright Act" because PCG's members can read and study the non-MOA works, the works can be quoted in sermons and other articles, and PCG can give out copies of the works that have been legitimately purchased. Pl. Mot. First Claim at 8.[5] Further, WCG argues that as a matter of law,

_____

(...continued)

> available for historical purposes for those who wish to research the unique teachings of Armstrongism.

> The material below is copyrighted and may not be reproduced in any form without written permission from the Worldwide Church of God.

> Worldwide Church of God, 2002

Id.; see also Court's Ex. 1 presented to the Court at oral argument (completed paperback copy of The Incredible Human Potential).

[3] The standard publishing options selected by WCG with regard to each of the non-MOA works include: (1) Option I – Electronic Distribution (the Works will be distributed "as electronic versions via [1st Books]"), and (2) Option II – Distribution as a Quality Paperback Book (1st Books will "prepare [each] work for distribution as a quality trade paperback version, obtain an International Standard Book Number (ISBN), and register [the] Work with distributors so that it may be available for sale via 'print-on-demand' (printed as ordered) as retail outlets using these systems"). Helge Decl., ¶ 12, Ex. RR.

[4] In light of the Court's denial of summary judgment, the Court finds that PCG's evidentiary objections are moot and need not be decided at this time.

[5] WCG notes that pursuant to 17 U.S.C. § 106, PCG cannot print its own copies of
(continued...)

7

having to pay for legitimately obtained copies of the non-MOA works cannot be considered a substantial burden. Id. at 10-11. WCG relies on the Ninth Circuit's opinion in Worldwide Church, wherein the court noted:

> Having to ask for permission, and presumably to pay for the right to use an owner's copyrighted work may be an inconvenience, and perhaps costly, but it cannot be assumed to be as a matter of law a substantial burden on the exercise of religion.

Worldwide Church, 227 F.3d 1121. Thus, WCG argues that PCG's claim fails because PCG cannot demonstrate a substantial burden on its religious exercise.

PCG responds that the price for the works under WCG's publication plan with 1st Books constitutes a substantial burden on the free exercise of PCG's religious beliefs. Defendant and Counter-Claimant Philadelphia Church of God Inc.'s Consolidated Opposition to Plaintiff's Motion for Summary Judgment on First and Second Counterclaims for Relief ("Def. Opp.") at 33. PCG argues that "[e]ven if the works were to be made available through 1st Books, the facts are nevertheless in dispute whether the prices that WCG seeks to charge . . . are so high as to amount to a 'substantial burden.'" Id. n.11. Further, PCG argues that "[n]othing in the Ninth Circuit opinion remotely suggests WCG could charge any price it wanted to for the Works; the price must be within reason or else it would amount to the effective denial that PCG alleged in its counterclaim." Id. Thus, PCG argues that "there is no basis for the Court to conclude as a matter of law that . . . PCG will not be burdened by having to buy [the non-MOA works] from the 1st Books website for whatever period of time WCG might continue to offer them." Id. at 32-33.

Next, PCG argues that the addition of the preface to the non-MOA works also constitutes a substantial burden on PCG's exercise of its religion because "the preface is '*offensive in the extreme*' to PCG and any one [sic] else who is interested in Mr.

_____

(...continued)
the works for distribution. Pl. Mot. First Claim at 8 n.8.

1   Armstrong's religious message." Id. at 33.  PCG argues that determination of whether

2   the preface imposes a substantial burden involves factual questions thereby precluding

3   summary judgment. Id. at 35.

4          The Court finds that there remain several issues of disputed fact with regard to

5   whether the WCG's publication plan is a reasonable accommodation under the

6   Copyright Act, whether the price at which WCG plans to sell the non-MOA works

7   constitutes a substantial burden on PCG's free exercise of its religious beliefs, and

8   whether the preface somehow impugns of PCG's religious beliefs.  Therefore, the

9   Court concludes that summary judgment on this ground as to PCG's claim under RFRA

10  is inappropriate.

11         Next, WCG moves for summary judgment on two additional grounds, arguing

12  that (1) a RFRA claim can only be asserted against the federal government – an

13  indispensable party under Fed. R. Civ. P. 19(a) – which has not been joined, and thus

14  the claim must be dismissed pursuant to Fed. R. Civ. P. 19(b), and (2) even assuming

15  *arguendo* that a RFRA claim is cognizable against WCG, the application of the

16  copyright act is narrowly tailored to serve a compelling government interest.  Pl. Mot.

17  First Claim at 16, 23.

18         The Court previously denied WCG's motion to dismiss as to the first ground in

19  its November 14, 2001 Order.  Because the parties have not cited any new authority,

20  and because the Court finds that there remain issues of fact to be resolved as to whether

21  PCG can demonstrate a "substantial burden," the Court concludes that the applicability

22  of RFRA remains an open issue to be decided at trial.  See November 14, 2001 Order at

23  11-13.

24         C.     PCG's Second Claim for Declaratory Relief (Fair Use)

25         WCG moves for summary judgment regarding PCG's second claim for a

26  "Declaration of Fair Use" of the non-MOA works, arguing that the case against fair use

27  is even stronger here than it was with regard to MOA because WCG has entered into

28  contracts with 1st Books to publish all of the non-MOA works in their entirety and that

9

1   such books will be available for purchase online and in book stores, thereby fulfilling

2   any religious needs asserted by PCG. See Plaintiff Worldwide Church of God's

3   Motion for Summary Judgment Regarding PCG's Second Claim for Declaratory Relief

4   (Fair Use) ("Pl. Mot. Second Claim") at 6-8. As such, plaintiff argues that each of the

5   four relevant factors weighs against PCG's fair use defense as it relates to the non-

6   MOA works. Id. at 10.

7       Courts consider four factors in determining whether one who infringes a

8   copyright is entitled to the affirmative defense of fair use: (1) the purpose and character

9   of the use, including whether such use is of a commercial nature or is for nonprofit

10  educational purposes; (2) the nature of the copyrighted work; (3) the amount and

11  substantiality of the portion used in relation to the copyrighted work as a whole; and

12  (4) the effect of the use upon the potential market for or value of the copyrighted work.

13  17 U.S.C. § 107. Section 107 "requires a case-by-case determination of whether a

14  particular use is fair." Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S.

15  539 (1985). In finding for WCG on PCG's fair use argument with regard to MOA, the

16  Ninth Circuit analyzed PCG's appropriation under the above four-factor test and

17  concluded that "[t]he first three factors weigh in WCG's favor and the fourth factor is,

18  at worst, neutral." Worldwide Church, 227 F.3d at 1120.

19      The first factor examines the purpose and character of the use. First, the court

20  must examine "whether the new work merely 'supersede[s] the objects' of the original

21  creation or instead adds something new . . . [i]n other words, whether and to what

22  extent the new work is 'transformative.'" Campbell v. Acuff-Rose, 510 U.S. 569, 579

23  (1994). In Worldwide Church, the Ninth Circuit noted that the fact that PCG had

24  copied MOA verbatim weighed against a finding of fair use. Worldwide Church, 227

25  F.3d at 1117. PCG does not submit that it will alter or "transform" the non-MOA

26  works; rather, "PCG admits that the rights it seeks to affirm through declaratory relief

27  in this action include, but are not limited to, the right to copy the Subject Works

28  verbatim, in their entirety, for the reasons, under the circumstances, and to the extent

10

1   alleged in the counterclaim." Declaration of Miles J. Feldman ("Feldman Decl."), ¶ 5,

2   Ex. DD, p. 7, lns. 24-28 (PCG's Response to WCG's Request for Admissions).[6] Thus,

3   this weighs against fair use. Second, the Court must analyze the use to which the

4   appropriated work is put. While generally use which is not commercial or for profit

5   favors a finding of fair use, in <u>Worldwide Church</u> the Ninth Circuit noted that PCG had

6   gained an "advantage" or "benefit" in the form of growth of its membership and

7   resulting contributions from the use of <u>MOA</u> "without having to account to the

8   copyright holder." <u>Worldwide Church</u>, 227 F.3d at 1119. It appears that PCG's

9   intended use of the non-<u>MOA</u> works also will give PCG such "advantage" or "benefit,"

10  where PCG has expressed its intention to distribute the non-<u>MOA</u> works in their

11  entirety free of charge to the public because the works "are central to PCG's religious

12  belief and practices." Amended Counterclaim ¶¶ 12, 20.

13      However, PCG contends that the facts are different as to the non-<u>MOA</u> works

14  than as to <u>MOA</u>, in that "WCG will not permit PCG 'to account to the copyright

15  holder' . . . [because] WCG will not license the Works to PCG." Def. Opp. at 30.

16  _____

17      [6] The entire text of WCG's request for an admission and PCG's response is as
    follows:
18

19  Request for Admission No. 13:

20
        Admit that PCG seeks to copy the entirety of each of the Subject Works.
21

22  Response to Request for Admission No. 13:

23      PCG objects to this request on the grounds that it is compound, vague, and
24  ambiguous, including as to the meaning of "seeks to copy."

25      Subject to and without waiver of the foregoing general and specific objections, PCG
26  admits PCG admits that the rights it seeks to affirm through declaratory relief in this action
    include, but are not limited to, the right to copy the Subject Works verbatim, in their
27  entirety, for the reasons, under the circumstances, and to the extent alleged in the
28  counterclaim." Feldman Decl., Ex. DD, p. 7, lns. 17-28.

11

WCG responds that "[t]he Ninth Circuit never said that WCG *had* to give PCG the opportunity to 'account' to WCG to prevail under the first factor." Worldwide Church of God's Consolidated Reply Brief in Support of Its Motions for Summary Judgment ("Pl. Reply") at 6. Rather, WCG argues that its publication of the works is sufficient because PCG "will be able to purchase as many legitimate copies of the Subject Works as it wants from 1st Books" which "functions exactly like a license." Id. at 7. Moreover, WCG argues that "*[n]o case* has ever held that an infringer is entitled to a fair use defense if the copyright holder will not negotiate a reasonable license. This would abrogate the Copyright Act and decades of 'fair use' jurisprudence." Pl. Mot. Second Claim 16 (citing Steward v. Abend, 495 U.S. 207 228-29 (1990) ("Nothing in the copyright statutes would prevent an author from hoarding all of his works during the term of the copyright.")). Thus WCG argues that the issue of whether or not WCG will license the works to PCG is irrelevant to the consideration of PCG's fair use claim.

The Court finds that the facts here are the same as those before the Ninth Circuit in its decision as to MOA, because PCG seeks to copy the entirety of the non-MOA works verbatim and intends to distribute the works to promote its religious practices. Therefore, the Court concludes that Ninth Circuit's holding controls as the law of the case and that this factor weighs against fair use.[7]

The second factor, "the nature of the copyrighted work," turns on whether the work is informational or creative. See Harper & Row, 471 U.S. at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction

_____

[7] WCG argues that PCG is judicially estopped from challenging the fact of whether publication will actually occur. Pl. Reply at 3. WCG bases its argument on the fact that PCG previously represented to the Court in opposing WCG's motion to continue the trial that "PCG does not contest that, so long as this case remains pending, WCG is prepared to have 1st Books 'publish' the books pursuant to their contract." Id. (citing Feldman Decl., Ex. KK, p. 6, ln 10-12.). Such an argument does not give rise to judicial estoppel. PCG's statement was made to bolster its argument that WCG's claim that it intends to publish is a litigation tactic. The statement was never intended to be a concession that WCG intended to publish the non-MOA works.

12

or fantasy."). In <u>Worldwide Church</u>, the Ninth Circuit held that this factor weighed against fair use, as Armstrong invested "creativity, imagination and originality" into writing <u>MOA</u>. <u>Worldwide Church</u>, 227 F.3d at 1118. Neither party contends that the Court should reach a different conclusion as to the creative status of the non-<u>MOA</u> works.

However, another consideration which may influence fair use analysis with regard to the second factor is the "unavailability" of the non-<u>MOA</u> works. November 14, 2001 Order at 17-18 n.5. "'[A] key, though not necessarily determinative, factor in fair use is whether or not the work is available to the potential user. If the work is 'out of print' and unavailable for purchase through normal channels, the user may have more justification for reproducing it than in the ordinary case. . . .'" 4 Nimmer on Copyright § 13.05 (citing S. Rep. No. 94-473, at 64 (1975)); <u>see also</u> <u>Harper & Row</u>, 471 U.S. at 553 ("Congress intended the unpublished nature of the work to figure prominently in fair use analysis."); <u>Triangle Publications v. Knight-Ridder Newspapers</u>, 626 F.2d 1171, 1176 fn. 14 (5th Cir. 1980) ("if the copyrighted work is out of print and cannot be purchased, a user may be more likely to prevail on a fair use defense."). In its prior order, the Court "note[d] without deciding the issue" that "if PCG establishes that seeking a license is a 'futile act' . . . it could be argued that PCG is no differently situated than a licensee seeking to license an out of print work" which may favor a finding of fair use. November 14, 2001 Order at 17-18 n.5. The Court did not decide the issue, however, because PCG had not submitted any evidence that PCG had made an offer to WCG to license the non-<u>MOA</u> works. <u>Id.</u>

PCG now argues that it extended an offer to license each of the non-<u>MOA</u> works for royalties dependent on the length of the works. Def. Opp. at 30-31; <u>see</u> Helge Decl. Ex. NN (PCG's offer letter). But, PCG claims that WCG declined the license offer and made no counter-offer. Def. Opp. at 22; Helge Decl. Ex. OO (WCG's response letter). In response, WCG contends that the issue of a license is irrelevant because WCG intends to publish the non-<u>MOA</u> works. Pl. Mot. Second Claim at 16; Pl. Reply at 7.

13

1    Because there remain factual disputes as to the status of the publication of the non-

2    MOA works and as to the futility of seeking a license, the Court concludes that

3    summary judgment is inappropriate on the present record.[8]

4        The third factor is the amount of copyrighted work used.  In Worldwide Church,

5    the Ninth Circuit noted that PCG copied the entirety of MOA and that "copying an

6    entire work 'militates against a finding of fair use.'"  Worldwide Church, 227 F.3d at

7    1118. (citing Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F.2d 1148, 1155 (9th

8    Cir. 1986)).  The court concluded that no special circumstances existed to justify

9    reproduction of the entire work, rejecting PCG's argument that copying the whole work

10   was reasonable because of its religious nature.  Worldwide Church, 227 F.3d at 1118-

11   19.  The court held that the third factor weighed against fair use because in light of

12   PCG's use "a reasonable person would expect PCG to pay WCG for the right to copy

13   and distribute MOA created by WCG with its own resources."   Worldwide Church,

14   227 F.3d at 1119.  Previously, this Court found that "WCG has offered no evidence

15   that PCG intends to copy the entirety of the non-MOA works" and thus the Court held

16   that on the record before it, the Court could not determine in whose favor this factor

17   weighed.  November 14, 2001 Order at 18.  WCG now offers PCG's admission that

18   "the rights it seeks to affirm through declaratory relief in this action include, but are not

19   limited to, the right to copy the Subject Works verbatim, in their entirety . . . ."

20   Feldman Decl., Ex. DD, p. 7, lns. 24-26.[9]  This admission suggests facts that are the

21   same as those presented to the Ninth Circuit with regard to MOA, namely, an intention

22

23       [8]  Although at oral argument the Court tentatively stated its view that summary
24   judgment was appropriate as to PCG's claim of fair use, for the reasons set forth above the
     Court concludes that summary judgment is not appropriate at this time.    The Court
25   recognizes, however, that upon the submission of further evidence at trial, the Court may
26   find that the actual publication of the non-MOA works suffices to tip the scales against
     PCG's claim of fair use, and may also constitute a reasonable accommodation under
27   RFRA.

28
         [9]  PCG submits no argument with regard to the third fair use factor.

                                                                                          14

1    to copy the entire works. The Court therefore concludes that this factor weighs against

2    finding fair use.

3           Finally, the fourth factor considers the effect of the infringing use on the

4    potential market or value for the copyrighted work. In <u>Worldwide Church</u>, the Court of

5    Appeals noted that "PCG's distribution of an unauthorized version of <u>MOA</u> [] harms

6    WCG's goodwill by diverting potential members and contributions from WCG" and

7    that WCG's plans to publish an annotated version of <u>MOA</u> further weighed against

8    finding that PCG's appropriation of the work is "fair." <u>Worldwide Church</u>, 227 F.3d at

9    1119-20. In light of WCG's claimed intention to publish the non-<u>MOA</u> works, WCG

10   argues that "[i]f PCG were allowed to copy and distribute the Subject Works for free,

11   this would have an immediate and detrimental impact on the potential market or value

12   of the Subject Works. . . . because the customers for the Subject Works are not likely to

13   purchase a copy of the Subject Works from 1ˢᵗ Books, if such a copy can be obtained

14   from PCG for free." Pl. Mot. Second Claim at 15. Thus WCG argues that whereas the

15   Ninth Circuit found the fourth factor to be "at worst, neutral," <u>Worldwide Church</u>, 227

16   F.3d at 1120, in this case, the fourth factor "weighs heavily against fair use." Pl. Mot.

17   Second Claim at 15.

18          PCG responds that, even if WCG were to publish the non-<u>MOA</u> works, there

19   would not be any true market competition among PCG's desired use of the works and

20   WCG's use of the works. Def. Opp. at 27. PCG maintains that its intention is "to

21   distribute Mr. Armstrong's writing as part of its religious mission to spread the

22   gospel," whereas WCG intends to distribute the non-<u>MOA</u> works "only in the market

23   for 'historical purpose for those who wish to research the unique teachings of

24   Armstrong.'" <u>Id.</u> (citing language from WCG's draft of the preface"). Further, PCG

25   argues that "there is *no* evidence that PCG or the people to whom it would distribute

26   the Works would be interested in obtaining prefaced editions of the Works from

27   WCG." <u>Id.</u> at 29. Thus PCG contends that there is a disputed fact as to whether the

28   markets would overlap. <u>Id.</u>

15

In considering the merits of PCG's contention that its use of the non-MOA works will not interfere with WCG's potential market[10] for the protected works, the Ninth Circuit's consideration of the issue is relevant. In Worldwide Church, the court dismissed as "speculative" and "miss[ing] the point" PCG's argument that "an annotated version [of MOA] would be so different as not to be competitive with PCG's MOA." Worldwide Church, 227 F.3d 1120. The court noted that "[t]he fact that the secondary use does not harm the market for the original gives no assurance that the secondary use is justified." Id. (quoting Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1124 (1990) (internal quotations omitted). The court further noted that even though the market factor is important, without a showing of justification under the first factor, there can be no fair use. Id. Even concluding that the fourth factor was, "at worst, neutral," the Court held that in light of its decision with regard to the first three factors, PCG's use of MOA was not fair use. However, as to the non-MOA works, the Court need not resolve at this time the issue of the claimed market overlap because the Court concludes that there remain disputed factual issues which prevent resolution of the fair use factors.

On the present record the Court concludes that only the first and third factors weigh against fair use, and that there remain factual issues in dispute with regard to the second factor. As such, the Court concludes that summary judgment as to PCG's claim of fair use is inappropriate at this juncture. However, WCG's motion for summary judgment is denied without prejudice to the motion being renewed upon completion of publication.

---

[10] When last before the Court, the parties disagreed as to whether the appropriate inquiry into the "potential market," Worldwide Church, 227 F.3d at 1119, was as to the theoretical or actual market for a given work. See November 14, 2001 Order at 18-19 n.7. However, because WCG has contracted to enter "traditional, reasonable" markets for the copyrighted works, the Court concludes that the dispute is no longer relevant. American Geophysical Union v. Texaco Inc., 60 F.3d 913, 931 (2d Cir. 1994).

III.   **PCG's MOTION FOR LEAVE TO REOPEN DISCOVERY AND FOR AN**
       **ORDER FINDING A SUBJECT MATTER WAIVER OF THE**
       **ATTORNEY-CLIENT PRIVILEGE**

PCG moves for leave to reopen discovery to reexamine Ralph K. Helge, the general counsel of WCG, with regard to "his communications with WCG regarding its litigation efforts to block PCG from circulating <u>MOA</u> and the Subject Works." Memorandum of Points and Authorities in Support of Defendant's Motion for (1) Leave to Reopen Discovery, and (2) An Order Finding a Subject-Matter Waiver of the Attorney-Client Privilege ("Def. Mot.") at 2.  PCG contends that on or about August 13, 2002, Helge wrote a letter to Bob Ardis, "a former PCG minister who now heads his own splinter church in South Carolina."  <u>Id.</u> at 2.  PCG claims that in said letter, "Mr. Helge purported to be responding to Mr. Ardis' request for 'accurate information about the case of <u>Worldwide Church of God v. Philadelphia Church of God</u>'" but that in the letter, "Mr. Helge disclosed to Mr. Ardis the substance of communications he had with WCG regarding this lawsuit and, in particular, the litigation decisions surrounding WCG's efforts to prevent the reproduction and distribution fo <u>MOA</u> and the Subject Works."  <u>Id.</u> at 3-4.  Defendant cites the following portion of the letter, in which Helge wrote:

> When Mr. Flurry first pirated <u>Mystery of the Ages,</u> a determination had
> to be made as to what action Worldwide Church of God should take.  It
> was my recommendation that, if action were not taken to enjoin Mr.
> Flurry's pirating action, he would continue to confiscate further goods
> of Worldwide Church of God.  It was decided to institute an action
> against PCG to enjoin them from pirating <u>MOA</u>.  My prediction as to
> Flurry's future conduct proved true because he filed a counteraction in
> which he claimed the right to publish 18 other works of Mr.
> Armstrong, based on the argument that they were central to his
> religion.

17

Id. at 4 (citing Declaration of Kelley M. Klaus ("Klaus Decl.") Ex. 1, p. 1). PCG contends that Ardis subsequently mailed copied of the Helge letter to numerous PCG members, including PCG ministers, employees, and officers. Def. Mot. at 4. PCG argues that the letter, a communication to a third party, constitutes a waiver of attorney-client privilege as to Helge's "communications with WCG concerning this lawsuit," id. at 5, because Helge "disclosed to Mr. Ardis the substance of the legal advice he gave to WCG concerning its conduct of this litigation." Id. at 7. Further, PCG argues that the waiver is as to all other such communications on the same subject. Id. at 8. Thus, PCG claims that because "the subjects addressed in these disclosed communications pertain directly to WCG's litigation strategy and tactics – and in particular to the litigation-related 'recommendations' that Mr. Helge himself made to WCG – Mr. Helge shattered the privilege as to all communications relating to these topics." Id. at 9.

PCG claims that it was not until one day after the close of discovery in the instant case that PCG learned that members of PCG had received copies of the letter. Id. at 5. PCG further claims that within days, PCG informed Helge that his action constituted waiver of attorney-client privilege, and thus PCG requested that WCG consent to allow PCG to renew the deposition of Helge and to serve a document request in connection with said deposition. Id. However, PCG claims that WCG refused to allow such discovery on the basis that Helge's communications with WCG are protected by the attorney-client privilege and the work-product privilege. Id.

PCG argues that statements as to WCG's litigation strategy are relevant to the calculation of actual damages, which is based on revenue lost as a result of the infringement, because PCG will be able to refute WCG's theory as to its loss of revenue "with evidence showing that WCG has no sincere plan – other than as a litigation ploy – to publish or otherwise exploit MOA." Id. at 10. Additionally, PCG claims that the communications about intent to publish are relevant to the calculation of statutory damages, which considers both lost profits and the attitude and conduct of the parties, because the communications are related to both of those considerations. Id. at

18

11. Finally, PCG argues that the statements are relevant to the resolution of PCG's counterclaim for declaratory relief as to fair use because evidence of intent to publish is related to the fourth fair use factor, which addresses the effect on the potential market for the copyrighted works. Id. at 12.

PCG now seeks an order finding that Helge has waived the attorney-client privilege as it pertains to Helge's advice as to litigation strategy. In response, WCG contends that Helge's letter to Ardis did not constitute legal advice in that it did not disclose the substance of any confidential communication and the letter only commented about obvious, public knowledge. Plaintiff Worldwide Church of God's Opposition to Defendant's Motion for (1) Leave to Reopen Discovery and (2) an Order Finding A Subject Matter Waiver of the Attorney-Client Privilege ("Pl. Opp.") at 4-5. Further, WCG argues that Helge's letter was merely a "generalized statement[] . . . of the 'I told my client to take action' variety" which does not amount to a waiver of privilege. Id. at 5. Finally, WCG argues that Helge did not intend to waive the privilege with respect to any privileged communications between WCG and himself, or between WCG and any other lawyer. Id. at 3; Declaration of Ralph K. Helge in Support of Plaintiff's Opposition ("Helge Decl.") ¶ 7.

In considering a challenge to the attorney-client privilege the Court applies California state privilege law, pursuant to Federal Rule of Evidence 501. See F.R.E. 501. The attorney-client privilege may be waived if the holder of the privilege has disclosed a "significant" part of the communication to a third party or consented to such disclosure. Cal. Evid. Code § 912(a). To be "significant" the disclosure must reveal enough substantive information so that the specific content of the communication has been disclosed. See Southern Calif. Gas. Co. v. Public Utilities Comm'n, 50 Cal. 3d 31, 49, 265 Cal. Rptr. 801, 812 (1990). However, mere disclosure of the conclusions arrived at by an attorney does not waive the attorney-client privilege as to the content of the communications. Id. (holding that a client's disclosure to a

19

third party that its lawyer had concluded that a contract was enforceable was not a "significant" part of the attorney-client communication so as to constitute waiver).

At oral argument, WCG contested whether Helge, as a church member and also as in-house counsel, is in fact the holder of the attorney-client privilege as to WCG. However, setting aside this consideration, the Court concludes that Helge's communication in his letter to Ardis does not rise to the level of a "significant" disclosure of attorney-client communications and even if it were, it appears that there was no intentional waiver. Id. Therefore, PCG's motion for a finding of waiver and to reopen discovery is denied.[11]

IV.   **CONCLUSION**

For the reasons set forth above, plaintiff's motion for summary judgment with regard to defendant-counterclaimant's first and second claims for declaratory relief is DENIED without prejudice.  Defendant's motion to reopen discovery and for an order finding a subject-matter waiver of the attorney-client privilege is DENIED.

IT IS SO ORDERED.

Dated:        November 14, 2002

                                        _Christina A. Snyder_
                                        CHRISTINA A. SNYDER
                                        UNITED STATES DISTRICT JUDGE

---

[11]     At oral argument WCG made a request for sanctions in connection with its opposition to PCG's motion.  WCG's request for sanctions is denied.

20