**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**TENTATIVE MINUTE ORDER**

Priority ✓
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

Case No.: CV-97-5306 CAS                    November 27, 2002

Title:   WORLDWIDE CHURCH OF GOD v. PHILADELPHIA CHURCH OF GOD,
         INC.

---

PRESIDING:    HONORABLE CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE

Maynor Galvez,                              Laura Elias,
Deputy Clerk                                Court Reporter

---

PLAINTIFF COUNSEL PRESENT:        DEFENDANT COUNSEL PRESENT:
None                              None

PROCEEDINGS:   **(1)  PLAINTIFF WORLDWIDE CHURCH OF GOD's MOTIONS
                      IN LIMINE NOS. 1-5[1]**
                      (Filed October 28, 2002)

               **(2)  PLAINTIFF WORLDWIDE CHURCH OF GOD'S MOTIONS
                      IN LIMINE NOS. 6-12**
                      (Filed November 4, 2002)

               **(3)  DEFENDANT PHILADELPHIA CHURCH OF GOD'S
                      MOTIONS IN LIMINE NOS. 1-4**
                      (Filed October 28, 2002)

               **(4)  DEFENDANT PHILADELPHIA CHURCH OF GOD'S
                      MOTIONS IN LIMINE NOS. 5-6**
                      (Filed November 4, 2002)

ENTER ON ICMS

NOV 27 2002

---

[1]    WCG has not numbered its motions in limine.  For
convenience, the Court herein has numbered the motions and will
refer to the motions as numbered.

1

521

I.   **PLAINTIFF'S MOTIONS *IN LIMINE***

    A.   <u>Plaintiff's Motion *in Limine* No. 1 to Exclude Any Evidence to Contradict the Ninth Circuit's Holding that PCG Used *MOA* as a Marketing Device</u>

       In order to maintain consistency during the course of a single lawsuit, the doctrine of law of the case prevents reconsideration of legal questions previously decided.  <u>See United States v. Houser</u>, 804 F.2d 565, 567 (9th Cir. 1986). However, "law of the case comes into play only with respect to issues previously determined."  <u>Quern v. Jordan</u>, 440 U.S. 332, 347 n.18 (1979).  Although WCG argues that the Ninth Circuit previously held that PCG used <u>MOA</u> "as a marketing device," Pl. Mot. No. 1 at 5 (quoting <u>Worldwide Church of God v. Philadelphia Church of God</u>, 227 F.3d 1110, 1119 (9th Cir. 200), the Ninth Circuit's decision arose in connection with the question of the value of <u>MOA</u> as a copyrighted work, and not as to whether PCG used <u>MOA</u> to "generate income."  Rather, the Ninth Circuit expressly recognized that the issue of whether PCG used <u>MOA</u> to "generate income" remained a disputed question, and the court expressly refused to resolve that question.  <u>Worldwide Church</u>, 227 F.3d at 1118 ("Putting aside the disputed question whether PCG uses <u>MOA</u> to generate income . . . .").  Furthermore, in addressing the issue of profits, the Court held only that PCG had "gained an 'advantage' or 'benefit' from its distribution or use of <u>MOA</u>."  <u>Id.</u>  Thus evidence as to whether PCG used <u>MOA</u> and the non-<u>MOA</u> works to generate income is admissible on the issue of damages for PCG's infringing use of the works.  Therefore, plaintiff's motion is denied.

    B.   <u>Plaintiff's Motion *in Limine* No. 2 to Exclude Evidence Regarding WCG's Religious Beliefs</u>

       The evidence WCG seeks to exclude regarding its religious beliefs includes, but is not limited to, evidence or argument that:

      –   Today, WCG allegedly is not a true follower of Herbert Armstrong
      –   Whether WCG changed its religious doctrine
      –   Whether it was "fair" or "unfair" for WCG to change its doctrine rather than starting a new church and "turning over" the church to PCG's members
      –   Whether WCG deceived anybody over its changes in doctrine by not disclosing the doctrinal shifts earlier, or how the doctrinal changes were handled

- What WCG's Christian duties are with respect to publishing or not publishing <u>MOA</u> or the non-<u>MOA</u> works
- WCG's current governance, whether or not it has changed, and whether or not it is more open, democratic, or less authoritarian

WCG argues that evidence of its religious beliefs and its changes in doctrine and leadership management style is not admissible for several reasons. First, WCG argues that admission of the evidence would violate the <u>Blue Hull</u> doctrine which prohibits courts from assessing the validity of religious beliefs. Pl. Mot. No. 2 at 8; <u>see</u> <u>Presbyterian Church in U.S. v. Elizabeth Blue Hull Memorial Presbyterian Church</u>, 393 U.S. 440, 449-50 (1969). WCG argues that PCG's goal in seeking to have this evidence admitted is to demonstrate that PCG was justified in copying <u>MOA</u> and the non-<u>MOA</u> works because PCG views WCG as no longer being a true follower of Armstrong's teachings. Next, WCG argues that the evidence is irrelevant to the issues related to copyright damages, and that admission of the evidence would confuse the issues, such that it should be excluded pursuant to F.R.E. 401, 402, and 403. Finally, WCG argues that in the event that PCG's RFRA claim proceeds, evidence of WCG's religious beliefs is irrelevant to the issue of whether PCG's religious beliefs have been substantially burdened. <u>Id.</u> at 10.

PCG acknowledges that evidence of religious beliefs is not admissible for the purpose of assessing the *validity* of such beliefs. However, PCG argues that it is entitled to introduce evidence of the *fact* of WCG's religious beliefs. Def. Opp. Mot. No. 2 at 6. PCG argues that such evidence is relevant and admissible to prove that WCG "would never have licensed Mr. Armstrong's works to others and that it has no desire (other than as a temporary litigation ruse) to sell his works to the public." <u>Id.</u> To support its argument, PCG relies upon <u>Martinelli v. Bridgeport Roman Catholic Diocesan Corp.</u>, 196 F.3d 409 (2d Cir. 1999). In <u>Martinelli</u>, a parishoner claiming that the Catholic Diocese owed him a fiduciary duty introduced evidence of the church's teachings that "the bishop is like a 'shepherd' to his 'flock' of parishoners." <u>Martinelli</u>, 196 F.3d at 430. The Second Circuit upheld the admission of the evidence against a First Amendment challenge, holding that it was permissible for a jury to "consider religious teachings and tenets . . . to determine not their validity but whether, as a matter of fact, [the parishoner's] following of the teachings and belief gave rise to a fiduciary relationship" between the parishoner and the Diocese. <u>Id.</u> at 431. The court observed that "the proper use of religious principles as facts and an improper decision that

religious principles are true or false bears a family resemblance
to the . . . rules of hearsay" where a statement may be
admissible for the fact that it was made, while at the same time
being inadmissible to prove the truth of the matter asserted.
Id. The Court noted that

> Similarly, the proposition advanced by a particular
> religion that "a bishop is like a 'shepherd' to the
> 'flock' of parishoners" cannot be considered by a jury
> to assess its divine approval or authority, but may be
> considered by the same jury to determine the character
> of the relationship between a partishoner and his or
> her bishop.

Id. PCG argues that additional circuit case law supports the
fact/ truth distinction it draws.  PCG cites Drevlow v. Lutheran
Church, Missouri Synod, in which case a minister claimed that a
church had circulated untrue information about him, namely, that
his spouse had been divorced.  Drevlow v. Lutheran Church,
Missouri Synod, 991 F.2d 468, 471 (8th Cir. 1993).  Plaintiff
alleged that "religious beliefs lead churches within the Synod to
automatically disqualify a minister from consideration if his
spouse has been previously married" and thus the misinformation
harmed his employment opportunities.  Id. at 472 n.3.  In
remanding the decision, the court noted that "[w]hile the
district court cannot constitutionally decide the validity of
these beliefs, the court may properly determine their existence."
Id.  PCG relies on these authorities to argue that it should be
permitted to introduced the fact of certain of WCG's religious
beliefs.  Def. Opp. to Pl. Mot. No. 2 at 2-5.  Next, PCG argues
that the fact of WCG's religious beliefs is relevant to several
issues with respect to damages.  Def. Opp. Mot. No. 2 at 8-10.
For example, PCG argues that the evidence is relevant to disprove
WCG's theory that it suffered lost future sales, since PCG argues
that WCG would have suppressed, rather than have sold, the works.
PCG makes the same argument as to lost licensing revenues.  Id.
at 8-10.  Finally, PCG argues that the evidence should be
admitted on PCG's counterclaims because it is relevant to the
declaration of fair use with respect to whether seeking a license
would have been futile, and it is relevant to the RFRA claim to
counter WCG's claims that PCG's religious needs can be satisfied
under the Copyright Act.  Id. at 11-12.

The Court now turns to its analysis of the parties'
arguments.  In Blue Hull, the Supreme Court held that while
courts may resolve secular disputes involving religious
institutions, the First Amendment precludes courts and
factfinders from assessing the validity of religious beliefs.

Blue Hull, 393 U.S. at 449-50. The Court concludes that evidence
regarding whether it was "fair" or "unfair" for WCG to change its
doctrine rather than starting a new church and "turning over" the
church to PCG's members would clearly require a factfinder to
weigh the "fairness" of WCG's actions and its doctrinal shifts.
Thus, this evidence is excluded under Blue Hull. Additionally,
evidence that WCG is no longer a true follower of Armstrong is
also impermissible because it would require the factfinder to
determine who is a true follower of Armstrong. However, the
Court recognizes that it may be necessary to allow evidence to be
introduced as to whether WCG now espouses doctrines which would
lead it to refuse to publish or license the works in question.
The Court reserves judgment on this issue and whether such
evidence should be excluded under F.R.E. 403.

Next, it appears to the Court that evidence of WCG's
"Christian duties" with respect to publishing or not publishing
MOA or the non-MOA works may also run afoul of Blue Hull. PCG
argues that there is no such conflict because it intends to
introduce the evidence only for the fact of the belief. Def.
Opp. to Pl. Mot. No. 2 at 6-8. Additionally, at oral argument,
counsel for PCG reiterated the importance of this evidence to PCG
with respect to, inter alia, the licensing issue. Counsel for
WCG responded, however, that admission of such evidence naturally
invites a dispute over what WCG's true beliefs are with respect
to its Christian duties, thus running into the Blue Hull problem.
For now, the Court reserves judgment as to the admissibility of
this evidence, and whether or not it can be offered simply for
the fact of the belief, or whether the evidence naturally leads
to the assessment of the validity of WCG's beliefs. The Court
notes, however, that complete reliance on Martinelli would be
misplaced. In Martinelli, the court noted that in the case
before it, the plaintiff "neither relied upon nor sought to
enforce the duties of the Diocese according to religious beliefs"
but rather, sought relief under applicable state law, and not
cannon law. Martinelli, 196 F.3d at 431 ("[C]hurch law is not
ours to assess or to enforce.").

Finally, PCG argues that evidence of WCG's deceit of its
members about its doctrinal changes is relevant to WCG's lack of
credibility with regard to its current legal positions. Def.
Opp. to Pl. Mot. No. 2 at 14. Further, PCG argues that evidence
of WCG's governance methods is relevant to whether MOA was a work
for hire. Id. With regard to this of evidence, the link appears
too tenuous even to survive the test for relevancy under F.R.E.
401 and 402. Therefore, the Court concludes that evidence with
respect whether WCG deceived anybody over its changes in doctrine
by not disclosing the doctrinal shifts earlier, or how the

doctrinal shifts were handled and evidence about WCG's current governance, whether or not it has changed, is not admissible.

Therefore, plaintiff's motion is granted in part, and denied in part.

C. _Plaintiff's Motion in Limine No. 3 Regarding Arguments Concerning WCG's Publication of MOA and the Non-MOA Works_

WCG argues that PCG should be precluded from making arguments:

- That WCG will not publish MOA and the non-MOA works during this lawsuit
- That WCG will not publish MOA and the non-MOA works after this lawsuit concludes
- That WCG's publishing of MOA and the non-MOA works is a sham, and
- That WCG is suppressing MOA and the non-MOA works

Plaintiff's motion is denied without prejudice. These matters appear to be arguments that the parties may be entitled to assert in some circumstances.

D. _Plaintiff's Motion in Limine No. 4 to Exclude 22,395 Pages of Documents Produced After Discovery Cut-off By PCG_

At oral argument, counsel for WCG conceded that due to the continuation of the trial date until March 4, 2003, any prejudice to WCG arising out the late production of the documents at issue in this motion is remedied by WCG now having time to review the documents and to reopen discovery if necessary. Thus, this motion in limine to exclude the documents for late discovery is moot. However, this ruling does not preclude WCG from later raising objections to the admissibility of the documents on grounds other than late production.

E. _Plaintiff's Motion in Limine No. 5 to Exclude Evidence and Argument Regarding Whether or Not WCG Will License the Subject Works (only the non-MOA works)_

The Court concludes that this evidence is irrelevant as to the claim for damages with regard to MOA; however, the evidence is relevant as to PCG's counterclaims for declaratory relief on (1) RFRA, and (2) fair use. Therefore, plaintiff's motion is granted in part, and denied in part.

F.   Plaintiff's Motion *in Limine* No. 6 Regarding PCG's
     Attempted or Actual Communications With Counsel

     The present motion is in regard to evidence of whether PCG
or its representatives sought the advice of legal counsel prior
to printing and distributing MOA.  In its responses to requests
for admission, PCG asserted that "PCG did receive and rely upon
the advice of counsel before its initial distribution of Mystery
of the Ages on the subject of whether it could alter the
copyright notice for that work."  Declaration of Miles J. Feldman
("Feldman Decl.") in Support of WCG's Motion *in Limine* re:
"Unfairness" of PCG's Monetary Contributions Being Paid in
Damages to WCG,[2] Ex. A, Defendant's Response to Plaintiff's First
Request for Admissions, Response Nos. 11, 12.  However, PCG
refused to answer further, claiming that "the request calls for
information protected by the attorney-client privilege."  Id.;
see also id., Ex. B, Response to Request for Production Nos. 99,
100.  Additionally, PCG asserted that it did not intend to rely
on an advice-of-counsel defense in this action.  Id., Ex. A,
Response to Request for Admission Nos. 11, 12; see also id., Ex.,
B, Response to Request for Production No. 99, 100.  Because PCG
asserted the attorney-client privilege as to the substance of any
communications with counsel and PCG represented that it would not
assert an advice-of-counsel defense, evidence as to the advice
PCG sought from legal counsel is excluded.  See Columbia Pictures
Industries, Inc. v. Krypton Broadcasting of Birmingham, Inc., 259
F.3d 1186, 1196 (9th Cir. 2001) (affirming the trial court's
exclusion of evidence of reliance on the advice of counsel where
until just before trial the defendant asserted attorney-client
privilege as to the relevant communications with counsel).
Additionally, neither party shall be permitted to make reference
to the fact of whether or not PCG sought the advice of counsel
prior to its actions with regard to the initial distribution of
MOA and its decision to alter the copyright notice.  Plaintiff's
motion is granted.

---

     [2]     It appears to the Court that the exhibits attached to
the Declaration of Miles J. Feldman in Support of Plaintiff's
Motion *in Limine* No. 8 Re: "Unfairness" of PCG's Monetary
Contributions Being Paid in Damages to WCG are instead the
exhibits that support Plaintiff's Motion *in Limine* No. 5 to
Exclude Evidence and Argument Regarding Whether or Not WCG Will
License the Subject Works.  Thus, the Court refers to these
exhibits in analyzing plaintiff's motion.

G.   Plaintiff's Motion *in Limine* No. 7 to Exclude Evidence
     Pertaining to Prior Litigation Involving California's
     Attorney General

WCG moves to exclude evidence related to a receivership
action that was instituted against WCG in 1979 by California's
Attorney General and which litigation was terminated in favor of
WCG.  See People ex rel. Dukemajian v. Worldwide Church of God,
127 Cal. App. 3d 547, 558 (Cal. App. 2d Dist. 1981) (upholding
the denial of attorneys' fees to the special deputy attorney
General appointed by the California Attorney general, and holding
that "[w]e are of the opinion that the underlying action and its
attendant provisional remedy of receivership were from the
inception constitutionally infirm and predestined to failure.").
Because evidence related to the 1979 receivership is irrelevant,
its probative value is substantially outweighed by the danger of
unfair prejudice to WCG and because it will confuse the issues at
trial, the Court excludes the evidence pursuant to F.R.E. 401,
402, and 403.  Therefore, plaintiff's motion is granted.

H.   Plaintiff's Motion *in Limine* No. 8 Regarding
     "Unfairness" of PCG's Monetary Contributions Being Paid
     in Damages to WCG

PCG is precluded from arguing that it would be unfair for
the church to pay damages from monetary contributions made to it
by its members.  Despite its status as a non-profit organization,
PCG is responsible for paying civil damages for which it is
liable, including damages for copyright infringement.  See, e.g.,
F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago, 754 F.2d
216, 219 (7th Cir. 1985) (affirming damage award against Catholic
Bishop of Chicago for the acts of 238 of its parishes in
infringing copyright held by publisher of religious music).
However, this ruling is not intended to preclude PCG from making
any other appropriate arguments to the effect that evidence of
its members' contributions is not properly considered in the
calculation of damages in this action.  Therefore, plaintiff's
motion is granted as set forth above.

I.   Plaintiff's Motion *in Limine* No. 9 to Exclude Report
     and Testimony of PCG's "Religion Expert" J. Gordon
     Melton

WCG argues that portions of the expert testimony of J.
Gordon Melton should be excluded.  The testimony challenged by
WCG can be divided into three distinct groups: (1) testimony
regarding WCG's religious beliefs, (2) testimony regarding the
sincerity of PCG's religious beliefs, and (3) testimony that PCG

did not use <u>MOA</u> as a marketing tool.  The Court considers each of these categories of testimony in turn.

Mr. Melton is one of PCG's expert witnesses.  He is the Director of the Institute of the Study of American Religion and is a Research Specialist with the Department of Religious Studies at the University of California at Santa Barbara.  Pl. Mot. No. 9, Ex. A (Expert Report of J. Gordon Melton) at 1.  He has taught various courses in the area of religious studies at various educational institutions, and has authored "numerous publications on religious groups."  <u>Id.</u>  Mr. Melton has studied WCG since the 1960s and has "continued to monitor the group" in subsequent years.  <u>Id.</u> at 2.  He has collected "an extensive library of the church's literature (facilitated by their policy of giving away for free all of their publications), publication of the many groups formed by former members, and a set of books and articles written by its critics."  <u>Id.</u>

First, the Court considers the issue of whether Mr. Melton may testify as to religious beliefs held by WCG.  It appears that Mr. Melton qualifies as an expert in the field of religious studies, and particularly with respect to the historical evolution of both WCG and PCG.  However, at oral argument, counsel for WCG persuasively argued that if there is disagreement about WCG's belief, WCG would be placed in the position of putting on a rebuttal witnesses to testify as to its beliefs.[3] Deciphering which beliefs are actually sincerely held by WCG runs afoul of the holding of <u>Blue Hull</u>, and must be avoided.  Thus, to the extent that he is permitted to testify with respect to WCG, the Court concludes that Mr. Melton's testimony is limited to an historical discussion of the formation and evolution of WCG and its reformation, and the founding of PCG.  Moreover, in the Court's view, Mr. Melton's testimony should be so limited because it appears that the relevant issue to be tried is whether the current beliefs of WCG would cause it to refuse to publish or grant a license in <u>MOA</u> and the non-<u>MOA</u> works.  Consequently, many of the historical facts to be testified to by Mr. Melton appear to be irrelevant to the narrow issues presented by this case.

Second, evidence of the sincerity of PCG's religious beliefs is irrelevant to the issues at trial here, and thus testimony by Mr. Melton as to such matters is excluded.  <u>See</u> discussion *infra* § Q. (*PCG's Motion in Limine to Exclude Evidence With Respect to*

---

[3]     Further, in its brief, WCG also objects to several of Mr. Melton's characterizations of its religious beliefs as "false and misleading."  Pl. Mot. No. 9 at 7.

the Sincerity of PCG's Religious Beliefs).

Third, evidence that PCG did not use <u>MOA</u> as a marketing tool is not admissible because the Ninth Circuit has already specifically held that PCG did use <u>MOA</u> as a "marketing device" to "evangeliz[e] in the Christian community" and that PCG profited from its use in terms of gaining the "advantage" or "benefit" of "attracting through distribution of <u>MOA</u> new members . . . ." <u>Worldwide Church of God</u>, 227 F.3d 1119, 1118.  Therefore, the Ninth Circuit's holding controls as the law of the case, and PCG is precluded from introducing evidence to the contrary.  <u>See United States v. Houser</u>, 804 F.2d 565, 567 (9th Cir. 1986). However, as set forth in the Court's ruling *supra* section A., PCG may present evidence that it did not use <u>MOA</u> to "generate income."

Therefore, plaintiff's motion is granted in part, and denied in part.

J. <u>Plaintiff's Motion *in Limine* No. 10 to Exclude Any Evidence that the Preface to *MOA* and the Non-*MOA* Works is Burdensome to PCG's Religion</u>

Plaintiff's motion is denied without prejudice to it being renewed at trial.  As a general matter, it appears that PCG should be entitled to argue that the preface burdens PCG's religion and that WCG should be able to argue that it is entitled by reason of its copyright to publish <u>MOA</u> and the non-<u>MOA</u> works with the preface.

K. <u>Plaintiff's Motion *in Limine* No. 11 to Exclude PCG's Duplicative Expert Witness Testimony</u>

It does not appear that the testimony is significantly duplicative.  Therefore, plaintiff's motion is denied without prejudice to it being renewed at trial.

L. <u>Plaintiff's Motion *in Limine* No. 12 to Exclude Evidence (1) That WCG Does Not Own the Copyright to *MOA* and the Non-*MOA* Works, (2) That Herbert Armstrong Gave an Implied License to PCG or to Anyone Else to Use *MOA* and the Non-*MOA* Works, and (3) The Testimony of Sealy M. Yates</u>

First, in <u>Worldwide Church</u>, the Ninth Circuit held that WCG owns the copyright in <u>MOA</u>, regardless of whether under the work-for-hire doctrine or by bequest from Armstrong who by his Will "left all of his real and personal property to WCG."  <u>Worldwide</u>

Church, 227 F.3d at 1114.  Under the doctrine of the law of the case, the same holding controls as to the non-MOA works, and thus WCG is the undisputed owner of the copyrights in the non-MOA works.  Therefore, PCG is precluded from disputing WCG's ownership of MOA and the non-MOA works.  PCG claims, however, that it does not dispute that WCG is the owner of the works, but rather the basis of WCG's ownership, i.e., PCG contends that it will introduce evidence at trial to demonstrate that MOA and the non-MOA works are not owned by WCG under the work-for-hire doctrine.  Def. Opp. to Pl. Mot. No. 12 at 1.  Such evidence is admissible as the basis for WCG's ownership of its copyrights in MOA and the non-MOA works remains a disputed issue in this action.  See November 14, 2001 Order at 21 (denying WCG's motion for summary judgment regarding PCG's claim for a declaration that the work was not produced as a work for hire).

Second, as to the issue of the existence of an implied license, PCG concedes in its brief that it will not contend that it has an implied license from Armstrong to distribute MOA and the non-MOA works.  Def. Opp. to Pl. Mot. No. 12 at 1.  Thus plaintiff's motion to exclude evidence that PCG has an implied license is granted.[4]

Third, WCG moves to exclude the testimony of Sealy M. Yates, one of PCG's expert witnesses.  Mr. Yates is an attorney who has been practicing law since 1969; he has also worked in the publishing industry since 1973.  See Def. Opp. to Pl. Mot. No. 12, Ex. A (Expert Report of Sealy M. Yates, "Yates Report"), p. 18.  Mr. Yates has extensive experience rendering legal services for publishers (and specifically, publishers of Christian works) and with authors.  Id. at 18-19.  He has served as an attorney and/ or literary agent for more than 300 authors "in negotiating their publishing agreements and in other related matters."  Id. at 18.  Additionally, he claims to have "extensive knowledge and experience in copyright law and entertainment law."  Id. at 19.

---

[4]       However, PCG argues that it intends to introduce evidence that "Armstrong publicly and repeatedly stated that the Works (including MOA) should be distributed freely and to the largest audience possible."  Def. Opp. to Pl. Mot. No. 12 at 1.  PCG argues that such evidence "is relevant, inter alia, to WCG's claim for damages based on lost sales and lost licensing fees, since it provides context for evaluating whether PCG's distribution of 99,000 free copies of MOA had any appreciable effect on the market value of that book."  Id. The admission of such evidence is not precluded by the Court's ruling on the motion at issue.

At oral argument, PCG's counsel contended that Mr. Yates is PCG's expert witness with respect to the issue of what a reasonable royalty is for the licensing of MOA. Indeed, in his expert report Mr. Yates concludes that during the relevant time period, the reasonable royalty for MOA "would not exceed $.32375 per copy." Id. at 2, 14. However, in his expert report, Mr. Yates posits conclusions with regard to several issues in addition to the royalty rate. Id. at 2, 8-12, 15-17. For example, Mr. Yates also states the following opinions:

(1)　the distribution agreements between [WCG] and [1st Books Library] relating to MOA and eighteen (18) other books authored by Herbert W. Armstrong are not publishing agreements, but are simply arrangements that enable WCG to have those book manuscripts printed and bound in book form or configured in electronic book format and made available for sale.

(2)　the fair market value of the copyright to . . . [MOA] was not adversely affected in any appreciable way as a result of the printing and free distribution of approximately 99,000 copies of MOA by [PCG].

(3)　the fair market value of the copyrights to The Wonderful World Tomorrow, What it Will Be Like; The Missing Dimension in Sex; The United States and Britain in Prophecy (1980 Version); Which Day is the Christian Sabbath?; Pagan Holidays - or God's Holy Days - Which?; and The Incredible Human Potential . . . were not adversely affected in any appreciable way as a result of the printing and free distribution of copies of [the works] by PCG.

Id. at 2. One of the key "facts" Mr. Yates admittedly based his conclusions upon with respect to the fair market value of WCG's copyrighted works is the "fact" that "Armstrong communicated to the church members of WCG, PCG, and the other followers of Armstrong, that because God had freely given Armstrong the information written and published in the books authored by him, then materials written by Herbert W. Armstrong should be distributed free of charge to anyone who wants them." Id. at 9; see also id. at 12 ("[B]ased on the stated doctrine of Herbert W. Armstrong that his writings are to be given away free-of-charge, . . . in my opinion, the free distribution of [the non-MOA works] by PCG would have had no appreciable adverse impact on the fair market value of the copyrights to [the non-MOA works].").

WCG objects to Mr. Yates' testimony for several reasons.
First, WCG argues that Mr. Yates' conclusions about Armstrong's
intentions with respect to his works are unsupported by the
evidence.  Pl. Mot. No. 12 at 9-10.  Specifically, WCG objects to
Mr. Yates' conclusion that "Mr. Armstrong never intended for
people to have to pay for copies of his literary works, and
during his life directed that such works be distributed freely to
people who valued them for their religious message," which
conclusion Mr. Yates apparently based upon a Letter from Gerald
Flurry to Matthew Hale dated March 14, 2002 (document produced by
PCG numbered 081396).  Id. at 10 (citing Yates Report at 4).  WCG
argues that in fact, there is evidence that "Armstrong intended
for all copyrights and control of his literary works to be vested
solely with WCG."  Id., Exs. D & E (Declaration of Herbert W.
Armstrong dated June 28, 1976, ¶¶ 7,[5] 11; Minutes of the Advisory
Council of Elders from December 4, 1988).  Thus, WCG argues that
Yates should not be allowed to testify as to what Armstrong
intended.  Second, WCG argues that Mr. Yates' opinions are purely
legal conclusions which are improper under F.R.E. 702.[6]  Id. at
10.  Third, WCG questions the reliability of Mr. Yates' testimony
under Daubert and Kuhmo Tire, arguing that his conclusions are
"fundamentally flawed" because he cannot know what Armstrong
intended because he never met him and because he did not consider
all of the evidence of Armstrong's intentions.  Id. at 10; see
Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589
(1993); Khumo Tire v. Carmichael, 526 U.S. 137, 147, 150-51, 152
(1999).[7]

After considering Mr. Yates' experience in the publishing
industry and reviewing the bases for his conclusions with respect
to reasonable royalty rates for the works at issues, the Court
concludes that Mr. Yates' testimony as to royalty rates is
sufficiently relevant and reliable under Daubert and Kumho Tire

---

[5]    It appears that the relevant paragraph in Armstrong's
Declaration is ¶ 8, not ¶ 7.

[6]    In response to WCG's argument on this point, the
Court concludes that Mr. Yates' testimony "will assist the
trier of fact to understand the evidence or to determine a fact
in issue" and thus this is not a proper basis for excluding Mr.
Yates' testimony.

[7]    In section N. infra, the Court has performed
extensive analysis of the relevant considerations under Daubert
and Kumho Tire; therefore, the Court does not repeat that
analysis here.

to be presented at trial.  If WCG so chooses, WCG is entitled to probe the assumptions underlying Mr. Yates' conclusions on cross-examination.  Additionally, the jury will receive cautioning instructions that the assumptions underlying Mr. Yates' opinions may not be admitted into evidence and that to the extent that the evidence relied upon by Mr. Yates constitutes hearsay, such evidence will not be considered by the jury for the truth of the matter asserted.

The Court also concludes that Mr. Yates' testimony as to the nature of the publishing agreements between WCG and 1st Books is sufficiently reliable based on Mr. Yates' experience in the publishing industry and his negotiation of numerous publication agreements.  However, before this evidence is deemed admissible, PCG must demonstrate that it is relevant to the issues at trial.

Finally, it does not appear to the Court that Mr. Yates' conclusions with regard to the fair market value of WCG's copyrighted works are sufficiently reliable, and his testimony on such issues is therefore excluded.

As set forth above, plaintiff's motion is granted in part, and denied in part.

## II.  **DEFENDANT'S MOTIONS _IN LIMINE_**

M.   Defendant's Motion _in Limine_ No. 1 to Exclude Evidence of Tithes, Offerings and Donations Made to PCG Allegedly as the Result of its Distribution of _MOA_

PCG argues that evidence of tithes, offerings and donations made to PCG should be excluded and that WCG should not be allowed to use such evidence to prove as "indirect profits" the contributions that PCG received as a result of distribution of MOA.  First, PCG argues that the "profits" theory is too attenuated and violates principles of copyright law which forbid damages based on speculative or remote theories of "indirect profits," especially as to contributions made after infringement of MOA ended.  PCG also offers Flurry's testimony that PCG did not distribute MOA to raise funds or obtain new members, and that a person experienced in religious fundraising said that PCG's distribution did not bear the earmarks of a fundraising campaign.  Def. Mot. No. 1 at 3.  Second, PCG argues that tithes and other donations freely made are not "profits" within 17 U.S.C. § 504(b) because "profits" has the narrow, traditional meaning of sales or investment-related income to a business over and above expenses. Id.  Moreover, PCG argues that RFRA precludes "profits" being defined to include the tithes and offerings made to PCG by people

who received a free copy of a religious work because such an interpretation would substantially burden PCG's tithing members' free exercise of religion.  Id.  Therefore, PCG argues to exclude the evidence from WCG's profits calculation as irrelevant and unduly prejudicial.

WCG responds that it is entitled to present evidence to the jury of tithes, offerings and donations to establish WCG's entitlement to recover profits under 17 U.S.C. § 504(b) because: (1) such contributions constitute "direct profits" where PCG specifically advertised the free distribution of MOA to generate membership and revenue, and (2) such contributions constitute "indirect profits" and WCG is entitled to recover the unfair benefit PCG obtained by using the MOA as a marketing tool to attract new members.  Next, WCG argues that RFRA does not apply because (a) the Court has already stricken the RFRA defense as to WCG's claim to recover damages, (b) the statute does not apply to intellectual property disputes, (c) WCG is measuring unjust enrichment and seeks to recover excess income/ profits, but does not seek to divest particular PCG members of their contributions and thus does not burden any individual's free exercise of religion.  Finally, WCG argues that under PCG's RFRA theory, a religious organization is free to infringe without consequence, which contravenes copyright principles that provide for recovery of damages and profits.

PCG replies that proving indirect profits requires WCG to demonstrate a nonspeculative basis for the amount of revenues attributable to the infringement, which PCG claims WCG has failed to do.  Def. Reply Mot. No. 1 at 10.  PCG also replies that it does not argue that as a non-profit organization it is immune from an award of damages, but only that "profits" are not provable here.  Id. at 12.  Further, with regard to RFRA, PCG argues that it need not plead RFRA as an affirmative defense, because the Court must construe 504(b) in light of RFRA's amendment of all federal statutes.  PCG incorporates its argument in its opposition to WCG's motion for summary judgment as to the application of RFRA to intellectual property disputes.  Finally, PCG responds that the profits calculation is based on the specific tithes and contributions made by PCG's members on the basis of their religious beliefs.

It seems to the Court that tithes may not be a proper measure of the damages under 17 U.S.C. § 504(b) because there are other reasonable explanations for the nexus between the distribution of the works and the tithes pledged or other contributions made by PCG's members.  See, e.g., infra discussion of the Crissey report at § N.  Therefore, defendant's motion is

granted in part, and denied in part.

N.   Defendant's Motion *in Limine* No. 2 to Exclude the John
     T. Crissey Expert Report, or Any Testimony By Him,
     Calculating or Referring to Any Donations,
     Contributions, Tithes, or Other Offerings Made to PCG
     Allegedly as the Result of its Distribution of *MOA*, or
     Any "Profits" or Monetary Benefit PCG Allegedly
     Obtained as a Result

     PCG contends that the expert report and testimony of Mr.
Crissey should be excluded as failing to meet Daubert's
requirements of scientific validity.  First, PCG argues that Mr.
Crissey's report is based on improper methodology because he
equates an uncontrolled correlation with a causal relationship.
Specifically, Mr. Crissey observed that persons who ultimately
received a copy of MOA increased their contributions at a greater
rate than those who never requested the book, *i.e.*, a correlation
that increased contributions are correlated with receipt of MOA
(at some point).  Second, PCG argues that it violates scientific
principles of data analysis to infer causation from a correlation
without more, *e.g.*, analysis of additional control factors that
might explain the differing behavior.  Def. Mot. No. 2 at 7-8.
PCG argues that in deposing Mr. Crissey, upon inquiry Mr. Crissey
admitted that "[h]e did not control for other factors because 'in
my opinion, the control is built in' because receipt of MOA 'is
the one factor that separates the two populations.'"  Id. at 9
(quoting Crissey Depo. Tr. at 105-106).  Thus, PCG argues that
because he did not analyze whether any other factor might have
caused the different contribution levels he observed, his
opinions "worthless" as to both the qualitative conclusion that
the distribution of MOA caused increased contributions, and as to
the quantitative estimate of the amount of contributions that are
attributable to distribution of the work.  Def. Mot. No. 2 at 9.
PCG provides the declaration of their own expert who declares
that Mr. Crissey's analysis "does not meet he minimum acceptable
level of investigation required by an expert in the field of
statistical methods, data analysis and damages determination, and
his methodology is not a statistically valid approach, to
conclude that the receipt of MOA caused recipients to increase
their contributions to PCG or to conclude that his 'excess
contributions' figure is a reasonable basis upon which to
estimate 'profits' attributable to distribution of MOA."
Declaration of Michael J. Wallace ("Wallace Decl.") ¶ 17.  Third,
PCG argues that Mr. Crissey failed to analyze facts that were
available to him, *i.e.*, PCG's pre-1996 contribution data (MOA was
distributed from 1997 - 2001), which data conclusively disprove
Mr. Crissey findings because the group of those persons who

ultimately received MOA increased its contributions at a greater rate than the group of those who never received MOA long before MOA was ever distributed.  Def. Mot. No. 2 at 12 (citing Wallace Decl. ¶ 29).

In response, first WCG argues that "statistical analysis based on comparisons, or correlation studies, are generally accepted as constituting prima facie evidence of causation."  Pl. Opp. to Def. Mot. No. 2 at 15 (citing Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1184-85 (9th Cir. 2002) (discussing gross statistical disparities as constituting prima facie evidence of discrimination)).  WCG also argues that Mr. Wallace conducted his examination of PCG's contributions in the same manner Mr. Crissey did, thus demonstrating that Mr. Crissey's analysis is appropriate.  Second, WCG argues that PCG misrepresents Mr. Crissey's report as a mere correlation and ignores Mr. Crissey's evaluation of other aspects of the case contributing to causation, including testimony of PCG representative as to the important of MOA in bringing in new members, PCG's solicitation of funds on its website, WCG's current practices of using MOA as a marketing tool which practices WCG claims PCG adopted, and other experts that have expressed opinions that the distribution of free copies of MOA deepened members' relationships with PCG. Pl. Opp. to Def. Mot. No. 2 at 13-14, 16.  WCG also contends that the Ninth Circuit's holding in Worldwide Church that PCG used MOA as a marketing device supports the causation analysis.  Id. at 16.  Third, WCG responds that Mr. Crissey used all relevant and reliable data available to him, and that he has sufficiently explained why he did not use the 1990-1995 data because he determined that the data was inferior, less accurate, less indicative and incomplete when compared with the 1996-2001 data. Id. at 19-20.  Moreover, WCG argues that the pre-1996 data is irrelevant since it is from the wrong time period, and that the data introduces extraneous variable, which diminish the controls for other variables.  Id. at 21.  Thus, WCG argues that Mr. Crissey's report and testimony should be presented to the jury, and any of PCG's challenges should be as to the weight of the evidence, not its admissibility.

PCG replies that despite his attempts to indicate what factors he did control for, Mr. Crissey does not deny that he did not control for the important factor that increased interest in and predisposition to the teachings of the PCG among the recipient group. Def. Reply. Mot. No. 2 at 8.  PCG argues that because as WCG point out, the advertising campaigns already performed a self-selecting function, the prime candidates for further communication with PCG were the persons who called in to receive literature.  Id. at 7-8.  Thus, without controlling for

predisposition, the conclusion that higher contributions are causally linked to receipt of MOA is scientifically and analytically flawed. Id. at 8-9. Moreover, PCG replies that WCG incorrectly equates the reports and methodologies of Mr. Crissey and Mr. Wallace because Mr. Wallace ran a "standard trend analysis," and not a correlation study, so that Wallace's failure to control for such alternative explanation does not undermine his analysis. Id. at 10.

Federal Rule of Evidence 702 allows for expert testimony where such testimony "will assist the trier or fact to understand the evidence or to determine a fact in issue." F.R.E. 702. To qualify, the expert's testimony must (1) be "based on sufficient facts or data," and (2) be "the product of reliable principles and methods." Id. Finally, the witness must have "applied the principles and methods reliably to the facts of the case." Id. In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court held that the trial court must "ensure that any and all scientific testimony . . . is not only relevant, but reliable." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). The Daubert Court set forth a non-exclusive list of factors for trial courts to consider, including: (1) whether the expert's technique or theory can be or has been tested, (2) whether the technique or theory has been subject to peer review and publication, (3) the known or potential rate of error of the technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) whether the technique or theory has been generally accepted in the scientific community. Id. at 595. In the Ninth Circuit, an additional factor to be considered is whether the expert has adequately accounted for obvious alternative explanations. See Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994) (excluding testimony where the expert failed to consider other obvious causes for the plaintiff's condition). Further, in Kumho Tire v. Carmichael, the Supreme Court held that the inquiry into relevance and reliability applies to all expert testimony, and that trial courts may consider the Daubert factors to the extent relevant, which depends on the nature of the issue, the expert's particular expertise, and the subject of his testimony. Khumo Tire v. Carmichael, 526 U.S. 137, 147, 150-51, 152 (1999) (noting that the trial court's gatekeeping role is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."). After consideration of the relevant factors, the trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered," thus requiring exclusion of the expert testimony.

General Electric v. Joiner, 522 U.S. 136, 146 (1997).  The burden
is on the party offering the expert testimony to demonstrate its
admissibility by a preponderance of the evidence.  Daubert, 509
U.S. at 592.

     The Court concludes that the expert testimony of Mr. Crissey
offered by WCG does not satisfy the standards of scientific
reliability required by F.R.E. 702, as articulated in Daubert and
its progeny.  WCG has not proffered evidence as to the first
three Daubert factors, namely, whether Mr. Crissey's methods have
been tested, published or subject to peer review, or the error
rates for the methods employed.  Moreover, it appears that Mr.
Crissey has failed to give appropriate consideration to the
possibility of additional factors that may explain the
coincidence between receipt of MOA and greater contributions.
Mr. Crissey opines that a causal relationship exists between
people who ultimately received copies of MOA and those who made
greater financial contributions to PCG; however, it appears that
other factors may explain any correlation between receipt of MOA
and increased contributions.  For example, as PCG suggests, Mr.
Crissey states that he did not consider the seemingly obvious
possibility that persons who ultimately received MOA were more
predisposed to contribute greater amounts of money to PCG than
were persons who did not receive MOA.  See Appendix of Exhibits
in Support of Defendant's PCG's Motions in Limine Nos. 1-4, Ex.
A, Deposition of John T. Crissey ("Crissey Depo.") p. 25, lns. 5-
19, p. 16, ln. 1 – p. 17, ln. 15, p. 21 8-25.  Thus, the Court
concludes that the methodology employed by Mr. Crissey has not
been shown to be sufficiently reliable to allow it to be
presented to the trier of fact and therefore his quantitative
estimate of the amount of contributions that are attributable to
distribution of MOA is not admissible.  See Joiner, 522 U.S. at
146.

     O.   Defendant's Motion in Limine No. 3 to Exclude Evidence
          of William T. Rintala's Expert Report, or Any Testimony
          By Him, Regarding a Proper Construction and Application
          of the Copyright Act

     William T. Rintala is an attorney who has practiced
copyright law for more than thirty years, and has written
extensively in the area.  Appendix of Exhibits in Support of
Defendant Philadelphia Church of God, Inc.'s, Motions in Limine
Nos. 1-4 ("Appendix of Exhibits for Defendant's Motions No. 1-
4"), Ex. V, Expert Report of William T. Rintala ("Rintala
Report") at 1.  WCG offers Mr. Rintala's testimony as an expert
in the field of copyright law and its intersection with issues
arising under the First Amendment to the United States

Constitution. In response to PCG's motion to exclude Mr.
Rintala's testimony, WCG argues that Mr. Rintala's report will
assist the trier of fact because he will "discuss the practical
implications of the law – the fact that the flip side (and the
necessary corollary) of the exclusive right to publish a work is
the right not to publish that work immediately or at all." Pl.
Opp. to Def. Mot. No. 3 at 5. Further, WCG claims that Mr.
Rintala's testimony is not on issues of pure law because he will
explain facts unfamiliar to layperson, _e.g._, that a copyright
owner may choose not to exploit the copyright or to distribute
the copyrighted work at a given point in time or at all, giving
the examples of Disney's limited release of its animated films
and George Lucas' distribution of the <u>Star Wars</u> movies. <u>Id.</u>

Despite WCG's attempt to frame Mr. Rintala's testimony as
factual, his report discusses the purposes behind the Copyright
Act and the legal limits on a copyright owner's decision to
_decide to suppress a particular copyrighted work, including the_
doctrines of "fair use" and "first sale" and what he terms the
"idea/ expression dichotomy." Rintala Report at 8-10. The Court
concludes that such testimony does not "assist the trier of fact
to understand the evidence or to decide a fact in issue," and
thus the testimony falls outside the purview of F.R.E. 702;
rather, Mr. Rintala's testimony consists solely of legal
conclusions, admission of which would impermissibly usurp the
role of the Court in interpreting the applicable law. <u>Crow Tribe
of Indians v. Racicot</u>, 87 F.3d 1039, 1046 (9th Cir. 1996)
("Expert testimony is not proper for issues of law. Experts
interpret and analyze factual evidence. They do not testify
about the law.") (internal quotations omitted). Therefore,
defendant's motion is granted.

P.   <u>Defendant's Motion _in Limine_ No. 4 to Exclude Any
     Evidence of Requests and/ or Offers to Pay for Copies
     of _MOA_ and the Non-_MOA_ Works From WCG</u>

PCG seeks to exclude evidence of requests and offers to pay
for copies of <u>MOA</u> and non-<u>MOA</u> works from WCG because WCG redacted
from the requests/ offers the names and contact information of
the persons who submitted them to WCG. The redacted documents
_were turned over to PGC on about June 25, 2002, in response to_
PCG's requests for discovery. Declaration of Kelly M. Klaus
("Klaus Decl.") in Support of PCG's Motions _in Limine_ No. 1-4, ¶
4. PCG contends that WCG will introduce this evidence to prove
one of the central issues in the damages portion of the trial,
namely, "whether people who received <u>MOA</u> free-of-charge from PCG
would have paid WCG as much as $22 or more for a copy of the
book." Def. Mot. No. 4 at 1. PCG argues that several of WCG's

witnesses, including John Loudon WCG's "publishing expert" and
Troy Dahlberg, WCG's "diminution in value expert" both relied on
evidence of such requests and offers in rendering their expert
assessments of WCG's lost sales opportunities and the lost value
of WCG's copyrighted works.  Id.  PCG argues that WCG has not
cited any authority to support the contention that the redacted
information is privileged, and thus WCG improperly redacted the
names and contact information of persons who submitted such
requests/ offers to WCG.  PCG argues that as a result, the
evidence of the requests/ offers should be excluded along with
any related testimony.

WCG responds that in turning over the requested documents at
issue in this motion, "WCG raised applicable objections,
including rights of privacy of those who communicated with WCG to
request religious literature."  Pl. Opp. to Def. Mot. No. 4 at 2.
Further, WCG submits that PCG initiated a meet and confer process
based on WCG's objections, but never filed a motion to compel or
other discovery motion to force further disclosure of the
redacted information.  Id.  WCG argues that PCG should not now be
able to move to exclude the evidence where PCG did not obtain,
during discovery, an order to compel the discovery of the
information.

The Court concludes that WCG was not required pursuant to
Fed. R. Civ. P. 26(b)(5) to seek a protective order to redact
information from its disclosed documents, but only to state the
basis upon which it asserted that some of the information
required to be initially disclosed was privileged or otherwise
protected from disclosure.  WCG timely objected to the disclosure
of the names and contact information for the persons who
submitted the requests and offers to purchase copies of MOA or
the non-MOA works on the basis of the rights of privacy of the
individuals who communicated with WCG to request religious
literature.  If PCG had wanted to pursue discovery of the
redacted names, PCG should have done so "within a reasonable
time" via a motion to compel under Fed. R. Civ. P. 37(a)(2)(A).
See Patelco Credit Union v. Sahni, 262 F.3d 897, 903, 913 (9th
Cir. 2001) (upholding the district court's decision to construe a
motion in limine brought on the eve of trial as a Rule 37 motion
to compel and to deny such motion as untimely).  PCG failed to do
so.  PCG cannot now use Fed. R. Civ. P. 37 to exclude the
entirety of the documents.  Therefore, PCG's motion is denied.

Q.   Defendant's Motion *in Limine* No. 5 to Exclude Evidence
     with Respect to the Sincerity of PCG's Religious
     Beliefs

PCG contends that the evidence cited below, which was
identified in WCG's Supp. & Am. Resp. to 5th Set of
Interrogatories, Response to Interrog. No 10, at 16-18, see PCG's
Appendix of Exhibits in Support of Motions *in Limine* Nos. 5-6,
Ex. G), is inadmissible for the purposes and on the claims set
forth below.  PCG argues that the facts at issue do not call into
question whether PCG's belief regarding free distribution of
literature is religious, rather than philosophical.  Def. Mot.
No. 5 at 6.  Further, PCG argues that WCG cannot now challenge
PCG's beliefs as lacking religious sincerity, where prior to the
death of Herbert Armstrong, WCG espoused the same beliefs as
religious.  Id. at 7.

PCG moves to exclude the following evidence with respect to
either the complaint or the counterclaim.

- Mr. Flurry denied previous claims to have 25
  Biblical titles.  (Fact no. 7)
- Mr. Flurry recanted a claim that he received
  revelations from a "Might Angel Directly from
  God."  (Fact no. 8)
- Mr. Flurry's claim that **Malachi's Message** is part
  of the Book of Revelations is allegedly
  inconsistent with PCG's alleged tenet that
  revelations may not be added.  (Fact no. 9)
- PCG's violation of the Copyright Act contradicts
  PCG's "principal tenet" that "all members are to
  subject themselves to the laws and regulations of
  the government of the land."  (Fact no. 11)
- Mr. Flurry claims to be the "only true prophet on
  the planet."  (Fact no. 13)
- Mr. Flurry's claim to disapprove of alcohol abuse
  is inconsistent with his alleged alcohol abuse and
  alcohol-related arrest.  (Fact no. 14)

PCG argues that the evidence cited above is "designed to
suggest that the PCG's beliefs on subjects other than the
distribution of literature are weird, shifting, inconsistently
applied, or biblically unsound."  Def. Mot. No. 5 at 8.  PCG
argues that the evidence should be excluded because (1) it is not
relevant to the issue of the sincerity of its beliefs, (2) it is
impermissible character evidence being introduced to prove PCG's
alleged propensity for insincerity, (3) admission of the evidence

would be unconstitutional because it "would violate the
prohibition on court evaluating the validity of religious
beliefs," and (4) it is unfairly prejudicial under F.R.E. 403.
Def. Mot. No. 5 at 9-11.

First, WCG responds that prior inconsistent statements made
by Flurry are admissible to impeach his credibility and the
credibility of PCG, if Flurry is called to testify.  Pl. Opp. to
Def. Mot. No. 5 at 1-2.  WCG argues that Flurry has made
statements about his "biblical titles" and his receipt of
revelations from a "mighty angel directly from God" which Flurry
later denied under oath.  WCG argues that Flurry has made other
inconsistent statements with respect to whether his book added to
the biblical Book of Revelations and as to whether he is the only
true prophet on earth.  Further, WCG argues that Flurry's
statements that PCG must follow the laws of the land are
contradicted by Flurry's statement that PCG would not follow the
Copyright Act.  However, evidence that Flurry has made
inconsistent statements in the past is not simply admissible to
attack Flurry's credibility under F.R.E. 613; rather, the
evidence must be inconsistent with the witness's in-court
testimony.  See United States v. McLaughlin, 663 F.2d 949, 952
(9th Cir. 1981).  Moreover, before WCG may examine Flurry about
inconsistent statements and conduct, WCG must demonstrate that
such evidence is relevant.

Second, WCG argues that the evidence that Flurry claims to
be the one true prophet is relevant to the RFRA claim because it
demonstrates that PCG distributed the works as a marketing tool
to persuade people to join the church, and not simply to promote
religious practice.  Pl. Opp. to Def. Mot. No. 5 at 3-4.  WCG
also argues that the evidence is not impermissible character
evidence because it proves Flurry's underlying motive to use the
works as marketing tools.  Id. at 4.  Next, WCG argues that
evidence of PCG's shifting religious beliefs is relevant to
whether PCG's distribution of the copyrighted works is based in
sincere religious beliefs, one of the elements PCG must
demonstrate under RFRA.  Id. at 7.  WCG claims that it "will
prove that distribution of literature is not a religious practice
commanded by PCG's faith."  Id. at 5-6 (citing, e.g., Expert
Report of Ruth Tucker, ¶ 7, Ex. A to Pl. Opp. to Mot. No. 6).
Finally, WCG argues that PCG has not met its burden to establish
that admission of the evidence unfairly prejudicial, and that in
fact, the evidence is highly probative and not prejudicial.  Id.
at 8-10.

The Court concludes that none of the evidence cited above is
relevant to issues at trial.  Thus, the evidence is excluded

pursuant to F.R.E. 402.  Moreover, the evidence cited above simply constitutes an attack on Flurry which will distract the jury from the issues at trial, and which will unfairly prejudice PCG.  Thus, the evidence is also excluded pursuant to F.R.E. 403. See Adv. Comm. Notes to F.R.E. 403 ("Unfair prejudice . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

PCG also moves to exclude the following evidence with respect to both the complaint and the counterclaims:

> – The PCG allegedly "has engaged in acts of financial and moral improprieties designed to deceive its contributors and members." (Fact no. 6)

PCG argues that this evidence should be excluded as irrelevant because it has no bearing on any religious tenet of PCG, let alone the tenet at issue with regard to distributing literature. Def. Mot. No. 5 at 12.

For the reasons set forth above, the evidence proffered in fact number 6 is excluded as to both the complaint and the counterclaims pursuant to F.R.E. 402 and 403.

PCG also moves to exclude the following evidence with respect to the counterclaims on fair use and RFRA:

> – PCG infringed WCG's copyrights in bad faith and altered the copyright notices.  (Fact no. 1).
> – PCG allegedly used <u>MOA</u> and the other works as a "public relations and marketing tool to obtain more revenues for itself."  (Fact no. 2)

PCG argues that evidence of bad faith infringement and the revenue-generating effects of distributing free literature should be limited to the complaint for damages with regard to distribution of <u>MOA</u>, and that such evidence has no bearing on whether PCG "sincerely believes that it has a religious command to distribute" the copyrighted works. Def. Mot. No. 5 at 13. PCG also argues that even if probative on the RFRA claim, such evidence are unduly prejudicial.  <u>Id.</u>

The Court is in agreement that the evidence proffered in facts number 1 and 2 is irrelevant to the counterclaims on fair use and RFRA, and thus are excluded as to those claims pursuant to F.R.E. 402.

Finally, PCG moves to exclude the following evidence with respect to the RFRA counterclaim only.

- PCG refused to negotiate for a license (fact no. 4)

PCG argues that even if true or relevant to the futility issue under RFRA, evidence of PCG's refusal to negotiate a license is not relevant with respect to the issue of the sincerity of PCG's religious beliefs about distributing the copyrighted works.  Def. Mot. No. 5 at 13.

The Court concludes that evidence with respect to whether PCG refused to negotiate a license is relevant the RFRA counterclaim and, in particular, the issue of futility.  However, this evidence is not relevant to the issue of the sincerity of PCG's religious beliefs, but rather, whether PCG's religion can be reasonably accommodated under RFRA and the Copyright Act.

Therefore, defendant's motion is granted in part, and denied in part.[8]

---

[8]   PCG concedes that the following evidence proffered by WCG may be relevant to the issue of the sincerity of PCG's religious beliefs and thus the Court does not reach a conclusion about the admissibility of this evidence.

- The PCG allegedly did not claim for years that its religious practices involved printing and distribution of the Subject Works.  (Fact no. 3).
- PCG could have written its own texts but refused to do so.  (Fact no. 5)
- The PCG's decision to obey the preliminary injunction forbidding distribution of MOA allegedly contradicts the claim that the PCG was under religious obligation to distribute Mr. Armstrong's works.  (Fact no. 10)
- PCG copyrights its own works but claims the right to print and distribute WCG's copyrighted works.  (Fact no. 12).

See Def. Mot. No. 5 at 3.

R.    Defendant's Motion *in Limine* No. 6 to Exclude Evidence of the Views of the PCG or Herbert Armstrong on Any Matters Related to Race, Any Alleged Racially Insensitive Contents of Armstrong's Writings as a Basis for the WCG Having Discontinued Them, or the WCG's Efforts At "Reconciliation" With Other Races or Faiths Following His Death

PCG moves to exclude evidence of the views of PCG or Armstrong on any matters related to race, any alleged racially insensitive contents of Mr. Armstrong's writings as a basis for WCG having discontinued them, or WCG's efforts at "reconciliation" with certain racial groups following Armstrong's death.  PCG argues that such evidence is inadmissible because (1) it is irrelevant to any material issue in the case, (2) admission of the evidence for WCG's proffered purpose is unconstitutional in that it would require an assessment of the truth or validity of religious beliefs, and (3) admission of the evidence will unfairly prejudice PCG and will only inflame the jury.  Def. Mot. No. 6 at 3-5.

WCG responds that if PCG "opens the door" by introducing evidence about WCG's motive for suppressing the copyrighted works and about whether WCG would have licensed the works to PCG, then WCG should be allowed to discuss its modification of religious tenets away from many of the doctrines espoused by Armstrong with respect to race, and toward WCG's current reformation and reconciliation efforts.  Pl. Opp. to Mot. No. 6 at 5.

The Court concludes that WCG should not be permitted to describe specific religious tenets - either its own, or PCG's - regarding racial issues because such evidence will be unfairly prejudicial and will confuse the issues at trial.  Thus the evidence is excluded pursuant to F.R.E. 403.  See Adv. Comm. Notes to F.R.E. 403 ("Unfair prejudice . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").  However, WCG is entitled to explain that its motivation for suppression of the copyrighted works is that in its view, certain of the writings of Armstrong are no longer socially acceptable.  Therefore, PCG's motion is granted in part, and denied in part.

IT IS SO ORDERED.